FIRST DEPARTMENT, JULY, 1989

(July 6, 1989)

■ IBM CREDIT FINANCING CORPORATION, Appellant-Respondent, v MAZDA MOTOR MANUFACTURING (USA) CORPORATION, Respondent-Appellant.—Order of the Supreme Court, New York County (William J. Davis, J.), entered on December 7, 1988, which denied plaintiff's motion seeking summary judgment on its claims for breach of contract and unjust enrichment and dismissal of defendant's third and fourth counterclaims for tortious conduct and fraudulent inducement and which denied defendant's motion seeking summary judgment on the contract claims and its third and fourth counterclaims, unanimously modified, on the law, to the extent of granting plaintiff summary judgment dismissing defendant's third and fourth counterclaims and, except, as so modified, affirmed, without costs.

In September 1985, the parties signed a letter of intent pursuant to which plaintiff IBM Credit Financing Corporation (IBM) agreed to provide financing to defendant Mazda Motor Manufacturing (USA) Corporation (Mazda) for its Flat Rock, Michigan, manufacturing facility. The contemplated financing was in the form of a leveraged lease in which IBM was to purchase the plant and lease it back to Mazda. At this time, it was known that legislation was being considered by Congress which would make substantial changes in the tax laws. The parties therefore inserted into their agreement, which was incorporated into a series of documents dated May 1, 1986, a mechanism which would compensate for such changes by adjusting the rate of return to IBM to maintain the net economic return "as would have been realized by the Owner Participant if such change in Tax Law had not occurred."

On October 22, 1986, the Tax Reform Act of 1986 (Pub L No. 99-514, 100 US Stat 2085) was enacted. Among its

451

provisions was the implementation of an alternative minimum tax (AMT). In a letter dated January 22, 1987, IBM wrote to Mazda advising it that, in any given year, IBM might be subject to the AMT, but that the company's tax position could not be ascertained until after the close of the particular tax year involved. Pursuant to a provision of the agreement obliging IBM to promptly notify Mazda of the financial implications of any tax change on the financing arrangement, IBM estimated that the AMT might require a rent adjustment in the range of between $2,000,000 and $13,000,000. Mazda responded that it did not consider the AMT a change for which rent adjustments to preserve IBM's return were contemplated by the financing agreement. IBM then proposed a termination of the agreement for which Mazda was to pay any contractually defined termination expenses plus $11,000,000. It gave an ultimatum to Mazda that, if the proposal were not accepted, it would proceed with the closing scheduled for later in 1987. Mazda then informed IBM that it considered IBM's conduct an anticipatory breach, terminating the agreement, and thereupon refused to put the balance of the facility under the lease. A formal termination agreement was executed on June 8, 1987, which removed any obstacle to Mazda's freedom to pursue alternate financing but expressly reserved the rights of the parties to proceed against each other for breach.

Upon the motion, both parties contended that the agreement was unambiguous and sought judgment on the contract claims as a matter of law. However, both offered extensive affidavits arguing the significance to the dispute of various documents extrinsic to the financing agreement. It is well settled that, where a "determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury" (*Hartford Acc. & Indem. Co. v Wesolowski,* 33 NY2d 169, 172; *Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.,* 32 NY2d 285). Therefore, denial of summary judgment with respect to the contract claims was entirely appropriate.

The third and fourth counterclaims alleging, respectively, tortious conduct of an unspecified nature and fraudulent inducement should have been dismissed, however. The third counterclaim alleges, in pertinent part: "IBM believed that Mazda could not negotiate and close a leveraged lease with another lessor in the time remaining after January 22, 1987, and IBM knowingly and intentionally instituted a tortious plan and course of conduct designed to compel Mazda to make

payments having a present value of not less than 15 million dollars, not provided for under the Agreements, by forcing Mazda to choose between making such payments or risking several hundred million dollars in additional financing costs." We have recently noted that, where an action clearly sounds in contract, the mere invocation of the terminology of tort will not serve to transform the matter into something it is not (SSDW Co. v Feldman Misthopoulos Assocs., 151 AD2d 293). In the absence of a breach of duty, independent of the contract, which results in injury, a tort claim will not lie (Clark-Fitzpatrick, Inc. v Long Is. R. R. Co., 70 NY2d 382, 389). Mazda's counterclaim fails to allege any actual damage resulting from IBM's attempt to exact termination fees and, thus, fails as a claim for prima facie tort (Zausner v Fotochrome, Inc., 18 AD2d 649; Penn-Ohio Steel Corp. v Allis-Chalmers Mfg. Co., 7 AD2d 441). Mazda also fails to allege that the asserted acts were motivated solely by malice and not merely by a desire to advance IBM's economic interests (see, Squire Records v Vanguard Rec. Socy., 25 AD2d 190, 191-192, affd 19 NY2d 797).

Mazda's fourth counterclaim asserts that a letter from IBM dated October 31, 1986, which notified Mazda of the change in corporate tax rates under the Tax Reform Act, fraudulently induced it to agree to new rent schedules (as reflected by various documents executed Nov. 7, 1986) in that the communication failed to specify the implications of the newly enacted AMT. It is evident, however, that the parties were already bound by the September 1985 commitment letter and by article IX of the May 1, 1986 document designated "Participation Agreement" providing for rent adjustments to compensate IBM for changes in the tax law. Thus, IBM's letter, which expressly warned that "further adjustments will, in all likelihood, be necessitated as further implications of the 1986 tax reform act are understood", cannot be reasonably regarded as a communication which constitutes an inducement in reliance upon which Mazda changed its position (see, New York State Urban Dev. Corp. v Garvey Brownstone Houses, 98 AD2d 767). Moreover, IBM's mere silence with respect to any impact of the AMT on the parties' agreement of which it might have had knowledge does not constitute fraud, absent a confidential or fiduciary relationship between it and Mazda (Moser v Spizzirro, 31 AD2d 537, affd 25 NY2d 941). Concur—Murphy, P. J., Kupferman, Carro, Kassal and Rubin, JJ.